## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| IN RE: TABITHA M. BRANNAN, | ) | |
|     Chapter 13 Debtor. | ) | Case No. 06-32392-DOT |
| | ) | |
| | ) | |
| TABITHA M. BRANNAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 06-03125-DOT |
| | ) | |
| ALAN BRYMER, CAITLIN BRADLEY, | ) | |
| GLADSTONE ENTERPRISES, INC., | ) | |
| GREAT NORTHERN TRADING COMPANY, | ) | |
| and CARL M. BATES, Chapter 13 Trustee | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| GLADSTONE ENTERPRISES, INC. | ) | Counter-Claimant |
| v. | ) | |
| TABITHA M. BRANNAN | ) | Counter-Respondent |
| | ) | |
| GREAT NORTHERN TRADING COMPANY | ) | Cross-Claimant |
| v. | ) | |
| ALAN BRYMER, TRUSTEE, and | ) | Cross-Respondents |
| ALAN BRYMER, individually, | ) | |
| CAITLIN BRADLEY | ) | |

### MEMORANDUM OPINION

Trial of this adversary proceeding was held on August 16, 2007, following which the

parties submitted proposed findings of fact and conclusions of law. The court makes the

following findings of fact and conclusions of law.

### Findings of Fact.

On September 6, 2006, debtor plaintiff Tabitha M. Brannan filed her chapter 13 case, which remains pending. Defendant Carl M. Bates serves as debtor's chapter 13 trustee. Since October 1999, debtor has resided in Fredericksburg, Spotsylvania County, Virginia.

Defendants Alan Brymer and Caitlin Bradley, who are husband and wife, are former Virginia residents and now reside in Provo, Utah. Brymer and Bradley still maintain property interests in Virginia. Brymer is also president and sole shareholder of Gladstone Enterprises, Inc., (Gladstone), a Virginia corporation having a place of business in Fredericksburg, Virginia. Gladstone is in the business of purchasing real properties that are in foreclosure.

Defendant Great Northern Trading Co., LLC, (Great Northern) is a limited liability company actively engaged in business in Virginia. Great Northern's CEO is Brooke Gilliam.

Chase Manhattan Mortgage Corporation (Chase) is the holder of a first deed of trust on debtor's residence that secures a note in the original principal amount of $135,553.00.

In 2003 debtor was involved in a motor vehicle accident and was out of work for about six months because of her injuries. When debtor was again able to work, she obtained employment in the mortgage field, an occupation she left in January 2006. She is currently a self- employed customer service representative for Brannan & Brannan Services, a business owned by her father.

In early 2005 debtor's mortgage loan with Chase was four to six months in arrears, and the trustee under the deed of trust scheduled a foreclosure sale of debtor's residence for April 27, 2005. Debtor needed approximately $7,500.00 to bring her loan current.

During April 2005 debtor received a lengthy set of marketing materials from defendants Brymer and Gladstone. These materials were flamboyantly directed toward enabling debtor to avoid foreclosure of her home by offering easy cash and a free pizza. The materials included two

2

testimonial-type letters purportedly from individuals who praised Brymer for his fairness in
resolving their real estate or foreclosure matters. (Pl.'s Ex. 1.)

After receiving these materials, debtor contacted Brymer by telephone. In a later
conversation, he told her that he would be able to assist her in avoiding foreclosure by paying the
approximately $7,500.00 necessary to stop the foreclosure in return for receiving forty percent of
the equity in debtor's residence. Debtor agreed to such an arrangement during a telephone
conversation.

On April 27, 2005, the day scheduled for the foreclosure sale, Steve Green, representing
defendant Gladstone, arrived at debtor's residence with documents for her to execute. (Green had
authored one of the testimonial letters attached to Gladstone's promotion materials.)

The following documents were presented by Green and executed by debtor on April 27:

a) an agreement and declaration of trust by and between debtor as "Grantors and Beneficiaries
[sic]" and defendant Bradley as trustee (the trust agreement); (Pl.'s Ex. 3.)

b) a deed by and between debtor as grantor and Bradley, trustee, as grantee; (Pl.'s Ex. 2.)

c) an assignment of beneficial interest of trust dated April 27, 2005, between debtor, as assignor,
and Gladstone, as assignee (the assignment of interest agreement), which stated that debtor
conveyed a forty percent beneficial interest in the trust created by the trust agreement to
Gladstone; (Pl.'s Ex. 4) and

d) a letter of agreement and addendum dated April 27, 2005 (the letter agreement). This
instrument was signed only by debtor, who also initialed each paragraph. It stated as follows:

> I am aware that I am transferring 40% of the ownership of the property to
> Gladstone Enterprises, Inc. This will entitle them to 40% of the proceeds when
> the house is sold. I also understand that as part of this agreement, I am required to
> jointly sell the house and pay off all underlying loans in the next 15 months. If I

3

fail to do this, I agree to transfer all remaining interest in the house to Gladstone Enterprises, and agree to comply with any suits against me to petition the sale.

Gladstone Enterprises has the right to borrow money against its equity. I agree to cosign on this/these loan(s), provided they will not show up on my credit report. I will not have to make any payments until the house is sold, and my proceeds from the sale of the house will not be reduced.

I have been made aware that my loan on my property contains a due on sale clause which means the lender has the right to call the entire loan due upon transfer of title. We agree that we will not commit any action to make any statement orally or in writing that will cause said lender to discover that title has been transferred.

I understand that the ownership is being transferred into a trust and the deed will no longer be in my name, and that the existing loan will stay in my name until it's paid off. I know that it will continue to show up on my credit report.

I also admit that I am not under the influence of any alcohol or drugs, and am of sound mind today and at every time in which I have communicated with the purchaser of this property.

I am also fully aware that Gladstone Enterprises, Inc. is acting as a co-owner in this transaction and plans to make, if possible, an unconscionable profit on this property.

I'm aware that the above company has no intentions of formally assuming said loan and that no promises have been made to me that the loan will be assumed or paid off by them. I know that this is not a loan, nor is the party accepting this sale a lending institution.

I agree to hold buyer and/or their heirs, assigns, corporation, and trustees or any future acceptor of this conveyance harmless and blameless, for any reason, from any debt, action, suit, payment, or any liability whatsoever that may be associated in any way with this agreement, or of notes, deeds of trust, or any other liens on this property.

(Pl.'s Ex. 5.)

None of the above instruments was recorded in the land records of Spotsylvania County.

It was Brymer's intention that the April 27 deed executed by debtor would not be recorded and

was not to be the permanent conveyance of debtor's property; instead it was to serve as Brymer's

4

temporary security for the transaction. After debtor executed the instruments, Brymer or

Gladstone caused a check in the amount of approximately $7,500.00 to be delivered to the

trustee under the Chase deed of trust, and the scheduled foreclosure sale was canceled.

During May 2005 Brymer advised debtor that he intended to take out a second deed of

trust loan on debtor's residence. The loan was to be made by defendant Great Northern for the

purpose of allowing Brymer or Gladstone to recoup the funds paid to stop the Chase foreclosure

as well as for the purpose of obtaining cash to finance other business activities. (Tr. 31, 36.) At

debtor's request, Brymer received Great Northern's approval for an additional loan of

$25,000.00, which he would then pay to debtor.

Settlement on the Great Northern second deed of trust loan on debtor's residence took

place on May 31, 2005. The transaction involved debtor's executing a second deed, this time

conveying title to Brymer as trustee. Debtor, as grantor, executed the deed, which was dated

May 31, 2005; she also signed a HUD settlement statement as seller. Brymer in his individual

capacity is shown as borrower on the settlement statement. (Pl's. Exs. 8, 11).  Both the deed and

the settlement statement reflected that the consideration for the transfer was $140,100.41. Line

603 of the settlement statement reflected no cash to seller; rather, line 503 showed the property

being sold subject to an existing loan in the amount of $140,100.41.

On May 31, 2005, the amount due Chase on its first deed of trust loan was approximately

$132,500.00. The amount shown on line 503 of the settlement statement includes the amount

previously paid by Brymer and Gladstone to prevent the April foreclosure. Line 1301 of the

statement shows as "Payoff to Tabitha Brannan" the sum of $25,000.00.

In connection with the settlement, Brymer in his individual capacity executed and

delivered to defendant Great Northern a promissory note dated May 25, 2005, in the stated

original principal sum of $74,725.00, bearing interest at the rate of ten percent per year

compounded monthly, with no payments due until 15 months from the date of the note. At the

end of 15 months all principal and accrued interest were to become due and payable.

Accordingly, on August 31, 2006, principal and interest in the total amount of $84,748.21 would

be due. (Pl's. Exs.10, 13.) Defendants Brymer and Bradley, individually, executed the Great

Northern note as guarantors. Although the Great Northern note stated that the original principal

amount was $74,725.00, this sum included a "loan origination fee" of 10.3379 percent, or

$7,725.00 (line 801 of the HUD settlement statement). Thus the original proceeds of the Great

Northern note were $67,000.00.[1] At settlement, debtor received $25,000.00 of the loan proceeds,

and Brymer or Gladstone received $39,483.69; the remaining balance of $2,516.31 went to

various closing costs.

In connection with the Great Northern settlement, Brymer as grantor in his individual

capacity executed a second deed of trust document that described a conveyance of debtor's

residence to trustees as security for the note. The deed of trust was undated; however, the

acknowledgment reflects that Brymer signed it on May 24, 2005. The trustees named in the deed

of trust were Paul C. Keincheloe, Jr., and Barry A. Schneiderman. (Pl's. Ex. 9.)

Debtor did not execute either the Great Northern note or deed of trust. Debtor's deed of

May 31 and the Great Northern deed of trust were recorded simultaneously in the office of the

Clerk of the Circuit Court of Spotsylvania County, Virginia, on June 1, 2005. (Pl's. Ex.12.)

Defendant Great Northern frequently provided secured business loans to Brymer and his

---

[1] The trial transcript (p.180) erroneously states that the loan disbursement was $57,000.00.

companies. In each of approximately twenty-six loan transactions between these two parties,

Brymer, Gladstone or a trust for which Brymer was a trustee was the 100 percent deed owner of

the pledged property. In none of these transactions was the loan repaid by the original owner of

the property. (Tr. 209.) At the time of settlement in the instant transaction, Great Northern's

executive officer was not aware of the provisions of the trust agreement between debtor and

Brymer or that Brymer might expect debtor to repay the loan. Debtor was not a party to the

negotiations and had no contact with Great Northern prior to settlement other than to permit a

walk-through of the residence.

Since May 2006, only debtor has made the first deed of trust payments to Chase, and she

has had full use of the house. The loan again became delinquent during the winter of 2005-06,

and debtor cured the default with her father's assistance. The loan then remained current up to

the time of trial when the current principal balance owed Chase was approximately $129,000.00.

In accordance with her obligations under the Chase deed of trust, debtor has also paid the

insurance and real estate taxes with respect to the residence (Tr.38-39).

Although no formal appraisal of debtor's residence property has been presented, the

consensus among the parties to this proceeding is that the value of the property during the April-

May 2005 time period was approximately $300,000.00.

As previously set out, the letter agreement signed by debtor on April 27, 2005, provided

that debtor was "required to jointly sell the house and pay off all underlying loans in the next 15

months." If she failed to do so, the agreement provided for debtor to transfer "all remaining

interest in the house" to Gladstone. (Pl's. Ex. 5.) In early 2006, debtor told Brymer that she

wished to keep her house and asked him about alternate options that would allow her to keep it.

Brymer replied that she could refinance the property and pay back the Great Northern loan,

which had an approximate balance of $85,000.00. This was the first time that debtor understood
Brymer expected her to repay the entire loan, including the portion that Brymer had borrowed.
Brymer referred debtor to "loan officers" who might help her refinance the property. (Tr. 37-38.)

Starting around April 2006, on a number of occasions Brymer inquired of debtor as to her
plans for paying the Great Northern note. Brymer presented debtor with other alternatives should
she not succeed in locating refinancing at a level sufficient to pay off both Chase and the Great
Northern note. These included the purchase of the property by Brymer or Gladstone for the
aggregate amount owing to Chase and to Great Northern. (Tr. 42-43.)

Debtor was not able to locate a lender willing to make a loan in an amount sufficient to
refinance the Great Northern note. Neither was Brymer able to fulfill his obligation to repay the
Great Northern note in full when it matured on August 31, 2006. (Tr. 40, 42, 142, 178.) In late
August 2006, Great Northern's executive officer, Ms. Gilliam, left several messages on debtor's
answering machine to the effect that she was calling in reference to the Great Northern loan that
was due in full at that time. (Tr. 210, 213-14.)

On September 6, 2006, Brymer sent a letter to debtor on Gladstone stationary asserting
that as of August 31, 2006, debtor had forfeited any ownership interest she had in her residence
because "[t]he 15 month period [referred to in the letter agreement of April 27, 2005] is over, and
you have failed to repurchase or sell the house despite many attempts on my part to assist you."
Also on September 6, Brymer executed a summons for unlawful detainer seeking to have debtor
evicted from her residence on the basis that "occupant forfeited option to purchase."  (Pl's. Exs.
14, 21; Tr. 137-138.) On the same day, September 6, 2006, debtor filed this chapter 13 case.

On September 25, 2006, debtor's counsel, Debra Corcoran, mailed to defendants Brymer,
Bradley and Great Northern a letter in which they were notified that debtor was rescinding the

8

Great Northern loan transaction pursuant to her rights under the Federal Truth in Lending Act,

15 U.S.C. § 1601 *et seq*. (TILA), and the Federal Homeowners Equity Protection Act, 15 U.S.C.

§ 1631 et seq. (HOEPA (Pl's. Ex. 22.) The defendants have not responded to this letter.

### **The Adversary Proceeding.**

Plaintiff debtor Tabitha M. Brannan initiated this adversary proceeding by her original

complaint filed September 7, 2006. An amended complaint was filed October 5, 2006, and a

second amended complaint on February 9, 2007. Plaintiff names as defendants, Brymer, Bradley,

Great Northern, Gladstone and Carl Bates, debtor's chapter 13 trustee. Bates has filed no

response to the complaint, and plaintiff argues that this failure to respond constitutes an implicit

permission to plaintiff to pursue the relief sought in the complaint.

The second amended complaint alleges five counts as follows:

Count I, fraudulent conveyance to Brymer of debtor's residence pursuant to Bankruptcy

Code §§ 548 and 550. Debtors seeks to have her transfer to Brymer set aside and title restored to

her.

Count II, fraudulent transfers of cash to Brymer pursuant to §§ 548 and 550. Debtor seeks

to recover the sum of $15,525.44 representing total loan payments from May 2005 to September

2, 2006 by debtor to Chase, the first deed of trust holder.

Count III, truth in lending violations by Brymer, Gladstone and Great Northern. Debtor

seeks to rescind the transfer of her property pursuant to provisions of 15 U.S.C. §§ 1601 et seq.,

plus an award of damages and attorney fees.

Count IV, fraud. Debtor alleges that in her property transfer she was defrauded by

defendants Brymer, Gladstone, and Bradley. Debtor requests the court to order defendants to

return the property and to remove the cloud on title caused by the Great Northern second deed of

trust. She also seeks actual damages.

Count V, punitive damages. Debtor alleges that the defendants perpetrated actual fraud,

acting willfully, maliciously, and with conscious disregard for her rights.

Prayer. Debtor requests actual damages in the amount of $100,000.00.

## Positions of the Parties.

Plaintiff

Under count I, plaintiff asks that the transfer of her residence be avoided and title

returned to her name. Count II seeks judgment against Brymer for sums plaintiff has made

monthly directly to Chase as payments on the first mortgage. In count III, truth in lending,

plaintiff asserts that she did not receive the proper disclosures at the time of the Great Northern

loan closing in May 2005, which entitles her to rescind that transaction. She prays that the

defendants be ordered to tender to her the deed to the residence, that they be ordered to pay her

statutory damages under TILA, and that they be ordered to pay the costs, expenses and attorney's

fees she incurred in bringing this action. Count IV is for common law fraud. Debtor asserts that

she was not told that the transaction would divest her of a substantial amount of equity in the

residence or that the May 2005 closing would result in her being divested of the residence but

remain liable for the Chase first deed of trust. She prays that the court order defendants to tender

back a clear title. In count V, debtor asks for punitive damages, and in her prayer she asks for

damages in the amount of $100,000.00.

Defendants Brymer, Bradley, and Gladstone

Brymer, Bradley and Gladstone filed their answer to the complaint and advanced several

affirmative defenses. They argue that TILA contains a one year statute of limitations beyond

which plaintiff may not seek statutory damages. They also claim that defendants are entitled to a

return of the $32,500.00 in value that defendants paid to plaintiff. They also argue that the

doctrine of unclean hands prevents plaintiff from arguing that she did not know the contents of

the documents she signed.

Gladstone has also filed a counterclaim, praying that the court order debtor to transfer the

remaining sixty percent of her beneficial interest in the trust created April 2005.

<u>Defendant Great Northern</u>

Great Northern has advanced four affirmative defenses: 1) that debtor lacks standing to recover

under §§ 548 and 550; 2) that debtor must avoid the transfer of the residence to Brymer before

the transfer from Brymer to Great Northern may be avoided; 3) that Great Northern gave value

for the transfer of an interest in the residence and is thus protected under § 548(c); and 4) that

Great Northern gave good faith in value without knowledge of the voidability of the transfer,

thus entitling it to protection under § 550(b).

Great Northern has also asserted four cross-claims: 1) against Brymer, praying for

judgment against him for the amounts due under his note to Great Northern, 2) against Brymer,

praying for the same relief as the first cross-claim but basing its demand for relief upon the deed

of trust between Brymer and Great Northern,[2] 3) praying that if the court finds it to be liable to

plaintiff in any way, Brymer be required to indemnify Great Northern to the extent that the

liability arises from the Great Northern Deed of Trust transaction, and 4) praying for judgment

---

[2] Specifically, Great Northern relies upon the provision of the deed of trust that provides that any
default on any prior lien on the residence would "constitute a default under the terms and
conditions of this Deed of Trust and the Note secured hereby." Because the Chase deed of trust
was in default at the time of the closing of the Great Northern deed of trust, Great Northern
argues that the Great Northern deed of trust was in default from its inception.

against Brymer and Bradley as guarantors for amounts due under Brymer's note to Great Northern.

In response to Great Northern's cross-claims, Brymer asserts several affirmative defenses: 1) Great Northern has failed to foreclose on the deed of trust, thereby failing to mitigate its damages; 2) Great Northern must pursue the principal prior to going against the surety; and 3) Brymer has the right of set off.

Finally, the issue of jurisdiction was raised by Great Northern at trial. Great Northern argued that its deed of trust may not be removed from debtor's residence unless the trustees to the deed of trust are named as parties in this adversary proceeding. The court presumes that this argument is premised upon Rule 19 of the Federal Rule of Civil Procedure and Rule 7019 of the Rules of Bankruptcy Procedure, which provide that a party must be joined as a party if 1) "the court cannot accord complete relief" among the parties without the missing party or 2) the missing party "claims an interest relating to the subject of the action" and "resolution of the action would impair or impede [the missing party's] ability to protect [its] interest."

## Discussion and Conclusions of Law.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.

AVOIDANCE COUNTS

In counts I and II of her complaint, debtor seeks to avoid or set aside the transfer of her residential real property to Brymer and also to set aside and recover the total monthly deed of trust payments that she made to Chase following the transfer. Debtor alleges she may avoid these transactions as fraudulent conveyances pursuant to Bankruptcy Code § 548, 11 U.S.C. § 548, and recover the property from Brymer pursuant to Bankruptcy Code § 550, 11 U.S.C. § 550.

12

Section 548 provides authority for a trustee in bankruptcy to avoid a debtor's actual or constructively fraudulent transfers of property that are made within two years prior to the debtor's bankruptcy filing.[3] Section 548(a)(1)(A) authorizes avoidance of a transfer made with actual fraudulent intent; § 548(a)(1)(B) authorizes avoidance of a transfer that was constructively fraudulent, *i.e.*, if the debtor received less than reasonably equivalent value in the exchange and the debtor was either insolvent or made insolvent by the transfer. Section 550 provides authority for a trustee to recover fraudulently transferred property or the property's value from a transferee.

As noted, these provisions specify that the avoidance powers may be exercised by a debtor's trustee in bankruptcy. Here, debtor's trustee has declined to bring an avoidance action, and it is the debtor who is asserting the trustee's avoidance powers. The only code provisions that authorize a debtor to exercise the trustee's avoidance powers under §§ 548 and 550 are found in § 522(h) and (g). Section 522(h) provides:

> (h) The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if -
>> (1) such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and
>>> (2) the trustee does not attempt to avoid such transfer.

---

[3] The avoidance period under § 548(a)(1) and (b) was extended from one to two years by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), which was enacted on April 20, 2005, and for most purposes became effective 180 days later on October 17, 2005. However, under § 1406(b) of BAPCPA the extended two year limitations period for § 548(a)(1) and (b) avoidance actions applied only with respect to bankruptcy cases filed more than one year after the enactment date of October 17, 2005. BAPCPA, Pub. L. No. 109-8, §§ 1402, 1406, 119 Stat. 23 (2005). Debtor's chapter 13 case was filed on September 6, 2006, and the two year limitations period is therefore applicable.

11 U.S.C. § 522(f).

Thus, a debtor may avoid a fraudulent transfer under § 548 only if the trustee does not

attempt to avoid the transfer, and only to the extent that the debtor could have exempted the

transferred property under § 522(g)(1) if the trustee had avoided it. In debtor's case, then, the

key to debtor's authority to bring this § 548 avoidance action is whether the transferred property

can be claimed exempt by her under § 522(g)(1). This subsection provides:

> (g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt
> under subsection (b) of this section property that the trustee recovers under section
> 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have
> exempted such property under subsection (b) of this section if such property had not been
> transferred, if -
> (1)(A) such transfer was not a voluntary transfer of such property by the debtor;
> and
> (B) the debtor did not conceal such property; . . .

11 U.S.C. § 522(g)(1).

In summary, the plaintiff debtor in this case may avoid her transfer to Brymer under §

548 provided she can exempt the property under § 522(g)(1). She may exempt the property

under this provision if the "transfer was not a voluntary transfer," and the property was not

concealed by debtor. 11 U.S.C. § 522(g)(1).[4]

Although there are cases that have allowed a chapter 13 debtor to exercise the trustee's

powers to bring a § 548 action, the provisions of § 522(h) and (g) are obvious limitations on the

debtor's standing, and the majority of courts have held that the debtor cannot exercise the

trustee's powers except within the confines of § 522(h). *See, e.g. Straight v. First Interstate Bank*

*of Commerce (In re Straight),* 200 B.R. 923, 928 (Bankr. D. Wyo. 1996);[5] *Hollar v. United*

---

[4] The Fourth Circuit has previously ruled that a transfer must be involuntary if it is to be set aside
under §§ 548 and 522(g)(1). *See Tavenner v. Smoot (In re Smoot),* 237 F.3d 401 (4th Cir. 2001)

[5] On appeal, the reviewing court found that the issue of standing had become moot, the case

*States (In re Hollar)*, 184 B.R. 25 (Bankr. M.D.N.C.), *aff'd*, 188 B.R. 539 (M.D.N.C. 1995),

*aff'd*, 92 F.3d. 1179 (4th Cir. 1996) (unpublished opinion); *In re Bardell*, 361 B.R. 468, 474

(Bankr. N.D. W.Va.), *aff'd*, 374 B.R. 588 (N.D. W.Va. 2007).[6]

In the parties' submissions to the court, there has been no discussion of the debtor's

standing to bring this adversary proceeding under § 548 in view of the restrictions under §

522(h) and (g). In his proposed findings of fact and conclusions of law (docket 65), debtor's

counsel argues only that debtor could have exempted the property under her Virginia homestead

exemption and § 522(b)(3)(B).

Counsel addresses indirectly the issue of whether the transfer of debtor's interest in the

residence was voluntary, citing a case in which a New York bankruptcy court considered

circumstances under which a debtor's conveyance of property might be considered an

involuntary transfer because of undue coercion by the transferee. In *Davis v. Suderov (In re*

*Davis)*; 148 B.R. 165 (Bankr. E.D.N.Y. 1992), *aff'd*, 169 B.R. 285 ( E.D.N.Y. 1994), the court

examined case law under which economic coercion or fraud might render a transfer involuntary

---

having been converted to chapter 7 and a trustee having been joined to the action. 207 B.R. 217
(B.A.P. 10th Cir. 1997).

[6] "In the context of a Chapter 13 case, it is the trustee and not the debtor that has standing to
directly assert a § 544(a)(3) cause of action. *E.g., Crawley v. Aurora Loan Servs. (In re
Crawley)*, 318 B.R. 512, 517 (Bankr.W.D.Wis.2004*)* (denying a chapter 13 debtor's attempt to
avoid a creditor's mortgage lien because the debtors were not trustees and had not been given the
powers of a trustee under § 544); *Gilliam v. Bank of Am. Mortgage, L.L.C. (In re Gilliam)*, No.
02-24491, 2004 WL 3622646, *3, 2004 Bankr. LEXIS 1653, *8 (Bankr. D. Kan. October 28,
2004) (holding that a Chapter 13 debtor lacked standing to avoid a mortgage under § 544(a)(3));
*In re Binghi*, 299 B.R. 300, 303 (Bankr.S.D.N.Y.2003) (holding that chapter 13 debtors were
unable to avoid a creditor's unperfected secured claim because they lacked standing); *Hollar v.
United States (In re Hollar)*, 174 B.R. 198, 203 (Bankr.M.D.N.C.1994) (finding that "there is no
statutory authority in Chapter 13 which grants a Chapter 13 debtor independent standing to sue
under the trustee's ... avoidance power")." 361 B.R. at 474.

and held under the facts before it that a debtor's pre-petition execution of a second mortgage on

her residence was in fact involuntary because of the transferee's misrepresentations and

"extraordinary sales pressure." *Id.* at 174.[7]

It is debtor's apparent position here that her transfer to Brymer was "not a voluntary

transfer" as referred to in § 522(g). The court cannot agree. The evidence in this case does not

reveal that Brymer applied undue pressure on debtor at the time of the transaction. The trust

documents signed by debtor and her testimony at trial persuade the court that while she was not

happy about it, she knew just what she was doing and acted under her "own free will." She

initialed each paragraph of the trust agreement, which contained a statement that debtor was

aware that Gladstone "plans to make, if possible, an unconscionable profit on this property."

(Pl's. Ex. 5.)[8]

In conclusion, as to the avoidance counts, the court finds that debtor made a voluntary

transfer of her residence and thus lacks standing to bring this action under §§ 548 and 550.

Therefore, debtor may not recover under counts I and II of the complaint.

 TILA COUNT

---

[7] Quoting the case *of Reaves v. Sunset Branch, Nat'l Bank of S.D. (In re Reaves);* 8 B.R. 177,
181 (Bankr. D.S.D. 1981), Davis set out what the court considered an appropriate standard as
follows:

> [A]n 11 U.S.C. Section 522(g)(1)(A) voluntary transfer occurs when a debtor, with
> knowledge of all essential facts and free from the persuasive influence of another,
> chooses of her own free will to transfer property to the creditor. A voluntary transfer does
> not occur where a creditor has harassed, insulted, and shamed a debtor into transferring
> the property to the creditor. Nor has a voluntary transfer occurred where a creditor has
> concealed or failed to inform a debtor of essential facts necessary for the debtor to make
> an intelligent decision on whether to transfer the property to the creditor. This is
> especially true where a debtor can show that she would not have made the transfer had
> she been informed of all the essential facts.

*In re Davis*, 148 B.R. at 173.
[8]In light of this discussion of debtor's actions, the court is unpersuaded by the affirmative

The third count of the complaint asserts a TILA count against Bradley, Brymer and Gladstone. In that count, debtor argues that debtor did not receive the proper disclosures at the time of the May 2005 loan closing, thereby entitling her to rescind that transaction.

TILA was enacted by Congress in order to protect the rights of consumers in specified credit transactions. The statute gives a consumer in those transactions a right to rescind the transaction for three days following the execution of a covered transaction. 15 U.S.C. § 1635(a). The rescission period may be extended to three years if the TILA-required disclosures are not accurate or are not provided to the consumer at the time of the transaction. 15 U.S.C. § 1635(f), 12 C.F.R. § 226.23(a)(3) (2007).

In order to rescind a typical covered consumer mortgage, TILA requires that the consumer give the lender notice of the rescission during the applicable rescission period. The lender then has twenty days within which to return all amounts paid by the consumer. Once that is done, the consumer must tender the property that was the subject of the transaction back to the lender. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3) (2007).

In addition to the remedy of rescission, TILA sets forth certain statutory damages allowable if the required disclosures do not comply with the provisions of TILA. Those damages are set forth at 15 U.S.C. § 1640(a). That section also contains a one-year statute of limitations. 15 U.S.C. § 1640(e). The one-year period begins to run in a closed-end credit transaction upon the date of the loan closing. *Tucker v. Beneficial Mortgage Co.*, 437 F.Supp.2d 584, 589-90 (E.D. Va. 2006); *see also Escher v. Decision One Mortgage Co. (In re Escher),* 369 B.R. 862 (Bankr. E.D. Pa. 2007). However, a consumer's ability to recover these statutory damages may

defense advanced by defendants that debtor was acting with unclean hands.

be resurrected in the event the lender fails timely to honor a proper request for rescission, regardless of the one-year limitation of § 1640(e). 15 U.S.C. § 1635(g).

In this case, the central question in resolving the TILA claim advanced by debtor is whether the transactions between debtor and Brymer, Bradley and Gladstone are transactions that are subject to TILA. Debtor argues that the April 2005 transactions among debtor and Brymer, Bradley and Gladstone in fact constituted an equitable mortgage under Virginia law, which would therefore be covered by TILA. Debtor's argument is based upon TILA's definition of a mortgage as "a consumer credit transaction that is secured by the consumer's principal dwelling." 15 U.S.C. § 1602(aa)(1). Regulation Z, the implementing regulation of TILA, supplements TILA's definition of "mortgage" by defining "security interest" as an interest securing performance that is recognized by state law. 12 C.F.R. § 226.2(1)(25).

Thus, in addressing the applicability of TILA in this case, the court must determine whether the transaction was really one that provided a creditor with an interest to secure performance, and the court must further determine that the interest is recognized by Virginia law. Debtor asserts that the transaction should be recharacterized as an equitable mortgage, which is recognized under Virginia law, thus making TILA applicable.

In Virginia, a deed that is absolute on its face is presumed absolute unless the challenging party can prove otherwise by clear and convincing evidence. *Pretlow v. Hopkins*, 30 S.E.2d 557, 558 (Va. 1947). In determining whether that presumption has been successfully rebutted, the court must consider the facts and circumstances surrounding the transaction.

This court has previously had occasion to evaluate whether the facts and circumstances surrounding a transaction constituted an equitable mortgage. In *Seven Springs, Inc. v. Abramson (In re Seven Springs, Inc.)*, 159 B.R. 752 (Bankr. E.D. Va.1993), *aff'd*, 35 F.3d 556(4th Cir.

18

1994), the court set forth the factors to be considered in determining whether a transaction was in fact an equitable mortgage. The court noted that "[t]he first and foremost factor to be considered . . . is the existence of a borrower-lender relationship between the parties. A mortgage occurs when there is some debt between the grantor and the grantee which is secured by the conveyance transaction." *Id.* at 756. In other word, the buyer/seller relationship can be construed as a mortgagor/mortgagee relationship if the seller is transferring title as security for a debt.

In the present case, debtor transferred title to her property to the trust in order to give Brymer and Gladstone[9] security for the amounts paid to stop the Chase foreclosure. In fact, at trial, Brymer testified that debtor's initial deed of transfer into the trust "was only meant to be a temporary form of security that I had." (Tr. 173). Essentially, debtor promised to pay forty percent of the equity in the residence to Brymer and Gladstone in exchange for the advance of the $7,500.00 advanced to stop the Chase foreclosure. Title to the residence initially went into the trust to be held as security for debtor's tender of the forty percent at the time of the sale of the house.

Further, when Brymer borrowed additional funds from Great Northern and disbursed a portion of them to debtor, he intended the residence to serve as security. That this was contemplated is evidenced by the second paragraph of the April 27, 2005, letter agreement signed by debtor in connection with the trust agreement: "Gladstone Enterprises has the right to borrow money against its equity. I agree to cosign on this/these loan(s), provided they will not

---

[9]While Bradley was listed as trustee on the agreements signed by debtor, there is some ambiguity as to the role of Brymer. However, Brymer is listed on the signature page of the trust agreement. The court, based upon the reading of the trust agreement, finds that Brymer was intended to have actual trustee powers as well as Bradley.

19

show up on my credit report, I will not have to make any payments until the house is sold, and

my proceeds from the sale of the house will not be reduced."

Once a borrower-lender relationship is established, the court may look at the

circumstances to determine whether an equitable mortgage has been created. *Seven Springs*, 159

S.E.2d at 756. Factors listed in *Seven Springs* are:

> [1.] the continuing obligation of the grantor to pay the debt or meet the obligation which
> it is claimed the deed was made to secure;
> [2.] the relative values of what the grantor received as compared to what the grantee
> received in the transaction;
> [3.] the parties' contemporaneous and subsequent acts;
> [4.] the parties' declarations and admissions;
> [5.] the form of the written evidence of the transaction;
> [6.] the nature and character of the testimony relied upon, and;
> [7.] the apparent aims and purposes of the conveyance.

*Id.*

Evaluating the transaction at issue in light of the seven factors of *Seven Springs*, the court

concludes that the transaction between debtor and Brymer, Bradley and Gladstone was an

equitable mortgage. Debtor had a continuing obligation to pay forty percent of the equity in the

residence to Gladstone. The parties acted at all times as though the residence was security, and

the testimony of Brymer referred to above certainly evidences that intention. The documents

surrounding the transaction show that the intent of the parties was to secure payment of the forty

percent by debtor's placing the title to the residence into the trust and then assigning forty

percent of her equitable interest in that trust to Gladstone.

Two factors listed in *Seven Springs* bear further consideration. There is a great disparity

between the relative monetary values of what debtor received as compared to what she gave to

Gladstone. However, the court in this case considers that the urgency of debtor's need to stop the

foreclosure militates in favor of balancing those two amounts. Debtor was under severe

constraints to stop the foreclosure, and she realized that she may have been making a bad

bargain. This is evidenced in the provision of the letter agreement dated April 27, 2005, that "I

am ...fully aware that Gladstone Enterprises, Inc....plans to make, if possible, an unconscionable

profit on this property." Thus, the court discounts the monetary disparity between the $7,500.00

and the value of forty percent of debtor's equity in the residence.

     A second factor that the court addresses is the representation of debtor in the April 27,

2005, letter agreement that "I know that this is not a loan, nor is the party accepting this sale a

lending institution." The court is not persuaded that this language is dispositive of any issues in

this adversary proceeding. Debtor is not an attorney and is not qualified to state what does or

does not qualify as a loan or a lending institution. The letter agreement was drafted on behalf of

Gladstone, and while debtor made some changes to the document, she cannot be expected to

know the legal implications of the language quoted in this paragraph. Thus, the court does not

attach a high degree of significance to this language in assessing the facts and circumstances

surrounding the transaction.

     The court notes that this issue has been addressed by the Eastern District of Virginia

twice within the past several months. In two recent decisions, the district court in *Johnson v. D &*

*D Home Loans Corp.*, 2008 WL 850870 (E.D. Va. Jan 23, 2008), and *Clemons v. Home Savers,*

*LLC*, 2007 WL 2815213 (E.D. Va. Sept. 21, 2007), employed the same analysis as that set forth

above and concluded that the transactions before it did not constitute equitable mortgages and

were therefore not subject to TILA. While the underlying structures of the transactions before

the district court differed from the structure of the transaction in this case, giving rise to a

different result, the district court recognized that if a transaction were characterized as an

equitable mortgage under Virginia law, the transaction might be covered by TILA.

21

Because the court has found that the transaction at issue was an equitable mortgage subject to TILA, debtor had the right to rescind it within three years if proper disclosures and information were not provided to her. It is undisputed that the proper disclosures were in fact not provided. Therefore, debtor has a three-year period within which to rescind the transaction. That period expires three years from the date of the execution of the transaction, which was April 27, 2005.

In a letter dated September 25, 2006, debtor attempted to exercise a right of rescission. However, that letter addresses the May 31, 2005, transaction between Brymer and Great Northern, and it does not operate as a rescission of the April 27, 2005, transaction between Brymer, Gladstone and Bradley. Because the right of rescission has not yet been exercised by debtor with respect to that transaction, the court will reserve making an award of damages, since such an award will be influenced by whether the right of rescission is exercised by debtor. In the event the right of rescission is properly exercised, one possible remedy under TILA might include the return of title to the property to debtor and repayment by debtor of all sums advanced to her.

FRAUD AND PUNITIVE DAMAGES COUNTS

Debtor has requested an award of punitive damages in the amount of $100,000.00 because the actions of Brymer, Bradley and Gladstone constituted actual fraud. While the court finds that Brymer may have been motivated by greed (acknowledging that he might stand to make an unconscionable profit on the deal), it cannot agree with debtor's claim that Brymer perpetrated actual fraud or acted willfully, maliciously and with conscious disregard of debtor's rights. To prevail on an actual fraud claim under Virginia law, debtor must prove her case by clear and convincing evidence, *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th

22

Cir. 1999), and debtor here has failed to do so.[10] Therefore, the punitive damages request will be

denied. This finding necessarily requires that debtor's claim for damages arising from Brymer's

fraud be denied as well.

CROSSCLAIM AGAINST BRYMER BY GREAT NORTHERN

In addressing the crossclaim of Great Northern against Brymer and Bradley, the court

finds that Brymer executed a promissory note in favor of Great Northern in the amount of

$74,725.00, which he has failed to repay. The note was guaranteed by Bradley. Therefore, the

court will issue judgment against them for any amount due under that promissory note.

With respect to the issue of whether Great Northern is secured by any interest in the

residence, it is critical to examine the facts and circumstances surrounding the May 2005

transaction between Brymer and Great Northern. Great Northern or its agents prepared all of the

documents executed in the transaction, and all of the documents were in the name of Alan

Brymer individually. Both the note and the second deed of trust were in Brymer's name

individually. The HUD statement prepared for closing was in Brymer's name individually. The

only May document that was not in Brymer's name individually was the deed recorded June 1,

2005, which purported to transfer title to the property from debtor to Brymer as trustee.

At trial, testimony of the chief executive officer for Great Northern leads to the

irrefutable conclusion that Great Northern, in entering into the deal with Brymer, thought that it

was dealing with him in his individual capacity. Unfortunately for Great Northern, title to the

residence was held by Brymer in his capacity as trustee. Therefore, it appears that he had no fee

---

[10] The court is of the opinion that the dispute between debtor and Brymer over which party is
ultimately responsible for the debt to Great Northern is a dispute as to the terms of the contract
between debtor and Brymer and is not in the nature of a fraud perpetrated against debtor by
Brymer.

23

simple interest in the property to convey to Great Northern through the second deed of trust.[11] As

a party cannot convey an interest he does not have, it appears that Great Northern has no interest

in the residence.[12]

The court notes that it has considered the question of whether the second deed of trust

and Brymer's promissory note to Great Northern could be construed as acts of the trustee rather

than of Brymer individually. As early as 1917, courts in Virginia have been willing to infer that

an individual was acting in the capacity of trustee when he executed documents but did not

include the word "trustee" on the signature line. *See Va. & W. Va. Coal Co. v. Charles*, 251 F. 83

(D. W.Va. 1917), *aff'd*, 254 F 379 (4th Cir. 1918). However, the courts will infer such a capacity

only if the intent is clear from the situation. For example, in *Needham v. Legge,* 2006 WL

1134064 (Va. Cir. Ct. March 28, 2006), the intent was made clear from the granting clause of the

deed itself, which set forth that the signatory was acting in his capacity as trustee. Thus, the court

inferred that the signatory was signing as trustee.

In this case, the facts surrounding the execution of the second deed of trust and the

promissory note from Brymer to Great Northern do not lead to the inescapable conclusion that

Brymer was acting in his capacity as trustee. In addition, Great Northern understood that Brymer

---

[11]The May 31, 2005, general warranty deed transferring title of the residence to Alan Brymer, trustee, as grantee, was not recorded in the clerk's office of the Spotsylvania County, Virginia, Circuit Court until June 1, 2005. Accordingly, a search of the title records for the residence prior to the May 31, 2005, closing would have revealed that title to the residence was held by plaintiff. Thus, on May 31, 2005, when defendant Brymer executed a second deed of trust on the residence, defendant Great Northern should have been aware that it was not the title holder of record of the residence.

[12]Under the general principle "nemo dat quod non habet" (one cannot give what one does not have), a purported transfer of personal property is ineffective to transfer anything other than void title. 22 Richard A. Lord, Williston on Contracts § 59.11(4th ed. 2007). Similarly, the general rule with respect to mortgages is that "it is essential to the existence of a mortgage...that the mortgagor hold some estate or interest capable of being mortgaged." 54 Am. Jur. 2d Mortgages §

was acting in his individual capacity. There is no language in any document that suggests

otherwise.

At trial, Great Northern argued that the trustees of the second deed of trust must be joined

as necessary parties. The court agrees that the trustees are requisite parties here, pursuant to

Virginia foreclosure procedures. *Conrad's Administrator v. Fuller*, 98 Va. 16, 34 S.E. 893

(1900); *Lloyd v. Lloyd*, 1984 WL 276326 (Va. Cir. Ct. Oct. 1, 1984), *Clasbey v. Clasbey*, 1992

WL 898114 (Va. Cir. Ct. Mar. 5, 1992). Accordingly, the court, upon appropriate amendment,

will order that they be joined as parties to this litigation and process issued as to them. The court

notes, however, that while this is the procedural requisite in this case under Bankruptcy Rule

7019, the court does not anticipate that the addition of the nominal trustees will change the

analysis set forth above. However, the court will reserve final ruling as to the validity of the

second deed of trust until the trustees under the second deed of trust have an opportunity to be

heard.

GLADSTONE COUNTERCLAIM

Gladstone has counterclaimed against debtor, arguing that under the April 2005 letter

agreement, she should be required to turn over her remaining sixty percent interest in the

residence. However, as this issue may be moot if debtor rescinds the underlying transaction, the

court defers ruling until the earlier of debtor's rescission or the expiration of the three year TILA

rescission period.

CONCLUSION

The court has been unable to dispose of all issues due to an imperfect record. Moreover,

the issues presented by the pleadings were not easily resolved or fully reconciled. Because of the

34 (2008).

open issues that remain and the possibility of additional pleading or appeal, debtor's counsel

have a period of fifteen days to amend or to file additional pleadings. If at that time there remain

issues that are unresolved, the parties must schedule a status conference promptly.

     Therefore, the court will defer entering an order in this adversary proceeding.

Signed_____

                  /s/ Douglas O. Tice Jr.
                  CHIEF JUDGE
                  UNITED STATES BANKRUPTCY COURT

 Copies to:

Tabitha M. Brannan
10009 Grass Market Court
Fredericksburg, VA  22408
*Debtor*

Augustus C. Epps, Jr., Esq.
Christian & Barton, L.L.P.
909 E. Main St., Suite 1200
Richmond, VA  23219-3095
*Counsel for Debtor*

Debra. D. Corcoran, Esq.
P.O. Box 29421
Richmond, VA  23233
*Counsel for Debtor*

Teddy J. Midkiff, Esq.
Goff & Midkiff, PLLC
10310 Memory Lane, Suite 2-C
P.O. Box 313
Chesterfield, VA  23832
*Counsel for Gladstone Enterprises, Inc., Caitlin Bradley, Alan Brymer*

Christopher G. Hill, Esq.
Roy M. Terry, Jr., Esq.
DurretteBradshaw, PLC
Main Street Centre
600 E. Main Street, 20th Floor
Richmond, VA  23219

26

*Counsel for Great Northern Trading Company*

Carl M. Bates
600 East Main Street
P.O. Box 1819 Richmond, VA  23218
*Chapter 13 Trustee*