**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| IN RE: TABITHA M. BRANNAN, | ) | |
|     Chapter 13 Debtor. | ) | Case No. 06-32392-DOT |
| | ) | |
| | ) | |
| TABITHA M. BRANNAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 06-03125-DOT |
| | ) | |
| ALAN BRYMER, CAITLIN BRADLEY, | ) | |
| GLADSTONE ENTERPRISES, INC., | ) | |
| GREAT NORTHERN TRADING COMPANY, | ) | |
| and CARL M. BATES, Chapter 13 Trustee | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| GLADSTONE ENTERPRISES, INC. | ) | Counter-Claimant |
| v. | ) | |
| TABITHA M. BRANNAN | ) | Counter-Respondent |
| | ) | |
| GREAT NORTHERN TRADING COMPANY | ) | Cross-Claimant |
| v. | ) | |
| ALAN BRYMER, TRUSTEE, and | ) | Cross-Respondents |
| ALAN BRYMER, individually, | ) | |
| CAITLIN BRADLEY | ) | |

## AMENDED MEMORANDUM OPINION

The court's initial memorandum opinion in this adversary proceeding was entered on

April 14, 2008. That opinion set out the court's findings of fact and conclusions of law on issues

presented by plaintiff-debtor's five-count complaint following trial. However, for reasons

apparent from the opinion, the court did not enter a judgment order. Subsequently, all parties

have filed motions that effectively request the court to alter or amend the court's conclusions that

were unfavorable to them and enter a final judgment order. A status hearing was held on May 7,

1

2008. After hearing argument at that hearing, the court took all pending motions under advisement. Still more responses were filed by the parties after the hearing.

Simultaneously with the issuance of this Amended Memorandum Opinion, the court is issuing a second memorandum opinion. That memorandum opinion addresses the various motions to dismiss.

## **Findings of Fact.**

On September 6, 2006, debtor plaintiff Tabitha M. Brannan filed her chapter 13 case, which remains pending. Defendant Carl M. Bates serves as debtor's chapter 13 trustee. Since October 1999, debtor has resided in Fredericksburg, Spotsylvania County, Virginia.

Defendants Alan Brymer and Caitlin Bradley, who are husband and wife, are former Virginia residents and now reside in Provo, Utah. Brymer and Bradley still maintain property interests in Virginia. Brymer is also president and sole shareholder of Gladstone Enterprises, Inc., (Gladstone), a Virginia corporation having a place of business in Fredericksburg, Virginia. Gladstone is in the business of purchasing real properties that are in foreclosure.

Defendant Great Northern Trading Co., LLC, (Great Northern) is a limited liability company actively engaged in business in Virginia. Great Northern's CEO is Brooke Gilliam.

Chase Manhattan Mortgage Corporation (Chase) is the holder of a first deed of trust on debtor's residence that secures a note in the original principal amount of $135,553.00.

In 2003 debtor was involved in a motor vehicle accident and was out of work for about six months because of her injuries. When debtor was again able to work, she obtained employment in the mortgage field, an occupation she left in January 2006. She is currently a self-employed customer service representative for Brannan & Brannan Services, a business owned by her father.

2

In early 2005 debtor's mortgage loan with Chase was four to six months in arrears, and the trustee under the deed of trust scheduled a foreclosure sale of debtor's residence for April 27, 2005. Debtor needed approximately $7,500.00 to bring her loan current.

During April 2005 debtor received a lengthy set of marketing materials from defendants Brymer and Gladstone. These materials were flamboyantly directed toward enabling debtor to avoid foreclosure of her home by offering easy cash and a free pizza. The materials included two testimonial-type letters purportedly from individuals who praised Brymer for his fairness in resolving their real estate or foreclosure matters. (Pl.'s Ex. 1)

After receiving these materials, debtor contacted Brymer by telephone. In a later conversation, he told her that he would be able to assist her in avoiding foreclosure by paying the approximately $7,500.00 necessary to stop the foreclosure in return for receiving forty percent of the equity in debtor's residence. Debtor agreed to such an arrangement during a telephone conversation.

On April 27, 2005, the day scheduled for the foreclosure sale, Steve Green, representing defendant Gladstone, arrived at debtor's residence with documents for her to execute. (Green had authored one of the testimonial letters attached to Gladstone's promotion materials.)

The following documents were presented by Green and executed by debtor on April 27: a) an agreement and declaration of trust by and between debtor as "Grantors and Beneficiaries [sic]" and defendant Bradley as trustee (the trust agreement) (Pl.'s Ex. 3);

b) a deed by and between debtor as grantor and Bradley, trustee, as grantee (Pl.'s Ex. 2);

c) an assignment of beneficial interest of trust dated April 27, 2005, between debtor, as assignor, and Gladstone, as assignee (the assignment of interest agreement), which stated that debtor

conveyed a forty percent beneficial interest in the trust created by the trust agreement to

Gladstone (Pl.'s Ex. 4); and

d) a letter of agreement and addendum dated April 27, 2005 (the letter agreement). This

instrument was signed only by debtor, who also initialed each paragraph. It stated as follows:

> I am aware that I am transferring 40% of the ownership of the property to Gladstone Enterprises, Inc. This will entitle them to 40% of the proceeds when the house is sold. I also understand that as part of this agreement, I am required to jointly sell the house and pay off all underlying loans in the next 15 months. If I fail to do this, I agree to transfer all remaining interest in the house to Gladstone Enterprises, and agree to comply with any suits against me to petition the sale.

> Gladstone Enterprises has the right to borrow money against its equity. I agree to cosign on this/these loan(s), provided they will not show up on my credit report. I will not have to make any payments until the house is sold, and my proceeds from the sale of the house will not be reduced.

> I have been made aware that my loan on my property contains a due on sale clause which means the lender has the right to call the entire loan due upon transfer of title. We agree that we will not commit any action to make any statement orally or in writing that will cause said lender to discover that title has been transferred.

> I understand that the ownership is being transferred into a trust and the deed will no longer be in my name, and that the existing loan will stay in my name until it's paid off. I know that it will continue to show up on my credit report.

> I also admit that I am not under the influence of any alcohol or drugs, and am of sound mind today and at every time in which I have communicated with the purchaser of this property.

> I am also fully aware that Gladstone Enterprises, Inc. is acting as a co-owner in this transaction and plans to make, if possible, an unconscionable profit on this property.

> I'm aware that the above company has no intentions of formally assuming said loan and that no promises have been made to me that the loan will be assumed or paid off by them. I know that this is not a loan, nor is the party accepting this sale a lending institution.

4

> I agree to hold buyer and/or their heirs, assigns, corporation, and trustees or any future acceptor of this conveyance harmless and blameless, for any reason, from any debt, action, suit, payment, or any liability whatsoever that may be associated in any way with this agreement, or of notes, deeds of trust, or any other liens on this property.

(Pl.'s Ex. 5).

None of the above instruments was recorded in the land records of Spotsylvania County. It was Brymer's intention that the April 27 deed executed by debtor would not be recorded and was not to be the permanent conveyance of debtor's property; instead it was to serve as Brymer's temporary security for the transaction. After debtor executed the instruments, Brymer or Gladstone caused a check in the amount of approximately $7,500.00 to be delivered to the trustee under the Chase deed of trust, and the scheduled foreclosure sale was canceled.

During May 2005 Brymer advised debtor that he intended to take out a second deed of trust loan on debtor's residence. The loan was to be made by defendant Great Northern for the purpose of allowing Brymer or Gladstone to recoup the funds paid to stop the Chase foreclosure as well as for the purpose of obtaining cash to finance other business activities. (Tr. 31, 36) At debtor's request, Brymer received Great Northern's approval for an additional loan of $25,000.00, which he would then pay to debtor.

Settlement on the Great Northern second deed of trust loan on debtor's residence took place on May 31, 2005. The transaction involved debtor's executing a second deed, this time conveying title to Brymer as trustee. Debtor, as grantor, executed the deed, which was dated May 31, 2005; she also signed a HUD settlement statement as seller. Brymer in his individual capacity is shown as borrower on the settlement statement. (Pl's. Exs. 8, 11).  Both the deed and the settlement statement reflected that the consideration for the transfer was $140,100.41. Line

603 of the settlement statement reflected no cash to seller; rather, line 503 showed the property being sold subject to an existing loan in the amount of $140,100.41.

On May 31, 2005, the amount due Chase on its first deed of trust loan was approximately $132,500.00. The amount shown on line 503 of the settlement statement includes the amount previously paid by Brymer and Gladstone to prevent the April foreclosure. Line 1301 of the statement shows as "Payoff to Tabitha Brannan" the sum of $25,000.00.

In connection with the settlement, Brymer in his individual capacity executed and delivered to defendant Great Northern a promissory note dated May 25, 2005, in the stated original principal sum of $74,725.00, bearing interest at the rate of ten percent per year compounded monthly, with no payments due until 15 months from the date of the note. At the end of 15 months all principal and accrued interest were to become due and payable. Accordingly, on August 31, 2006, principal and interest in the total amount of $84,748.21 would be due. (Pl's. Exs.10, 13.) Defendants Brymer and Bradley, individually, executed the Great Northern note as guarantors. Although the Great Northern note stated that the original principal amount was $74,725.00, this sum included a "loan origination fee" of 10.3379 percent, or $7,725.00 (line 801 of the HUD settlement statement). Thus the original proceeds of the Great Northern note were $67,000.00.[1] At settlement, debtor received $25,000.00 of the loan proceeds, and Brymer or Gladstone received $39,483.69; the remaining balance of $2,516.31 went to various closing costs.

In connection with the Great Northern settlement, Brymer as grantor in his individual capacity executed a second deed of trust document that described a conveyance of debtor's residence to trustees as security for the note. The deed of trust was undated; however, the

---

[1] The trial transcript (p.180) erroneously states that the loan disbursement was $57,000.00.

acknowledgment reflects that Brymer signed it on May 24, 2005. The trustees named in the deed of trust were Paul C. Kincheloe, Jr., and Barry A. Schneiderman. (Pl's. Ex. 9)

Debtor did not execute either the Great Northern note or deed of trust. Debtor's deed of May 31 and the Great Northern deed of trust were recorded simultaneously in the office of the Clerk of the Circuit Court of Spotsylvania County, Virginia, on June 1, 2005. (Pl's. Ex.12)

Defendant Great Northern frequently provided secured business loans to Brymer and his companies. In each of approximately twenty-six loan transactions between these two parties, Brymer, Gladstone or a trust for which Brymer was a trustee was the 100 percent deed owner of the pledged property. In none of these transactions was the loan repaid by the original owner of the property. (Tr. 209) At the time of settlement in the instant transaction, Great Northern's executive officer was not aware of the provisions of the trust agreement between debtor and Brymer or that Brymer might expect debtor to repay the loan. Debtor was not a party to the negotiations and had no contact with Great Northern prior to settlement other than to permit a walk-through of the residence.

Since May 2006, only debtor has made the first deed of trust payments to Chase, and she has had full use of the house. The loan again became delinquent during the winter of 2005-06, and debtor cured the default with her father's assistance. The loan then remained current up to the time of trial when the current principal balance owed Chase was approximately $129,000.00. In accordance with her obligations under the Chase deed of trust, debtor has also paid the insurance and real estate taxes with respect to the residence (Tr.38-39).

Although no formal appraisal of debtor's residence property has been presented, the consensus among the parties to this proceeding is that the value of the property during the April-May 2005 time period was approximately $300,000.00.

As previously set out, the letter agreement signed by debtor on April 27, 2005, provided that debtor was "required to jointly sell the house and pay off all underlying loans in the next 15 months." If she failed to do so, the agreement provided for debtor to transfer "all remaining interest in the house" to Gladstone. (Pl's. Ex. 5) In early 2006, debtor told Brymer that she wished to keep her house and asked him about alternate options that would allow her to keep it. Brymer replied that she could refinance the property and pay back the Great Northern loan, which had an approximate balance of $85,000.00. This was the first time that debtor understood Brymer expected her to repay the entire loan, including the portion that Brymer had borrowed. Brymer referred debtor to "loan officers" who might help her refinance the property. (Tr. 37-38)

Starting around April 2006, on a number of occasions Brymer inquired of debtor as to her plans for paying the Great Northern note. Brymer presented debtor with other alternatives should she not succeed in locating refinancing at a level sufficient to pay off both Chase and the Great Northern note. These included the purchase of the property by Brymer or Gladstone for the aggregate amount owing to Chase and to Great Northern. (Tr. 42-43)

Debtor was not able to locate a lender willing to make a loan in an amount sufficient to refinance the Great Northern note. Neither was Brymer able to fulfill his obligation to repay the Great Northern note in full when it matured on August 31, 2006. (Tr. 40, 42, 142, 178) In late August 2006, Great Northern's executive officer, Ms. Gilliam, left several messages on debtor's answering machine to the effect that she was calling in reference to the Great Northern loan that was due in full at that time. (Tr. 210, 213-14)

On September 6, 2006, Brymer sent a letter to debtor on Gladstone stationary asserting that as of August 31, 2006, debtor had forfeited any ownership interest she had in her residence because "[t]he 15 month period [referred to in the letter agreement of April 27, 2005] is over, and

you have failed to repurchase or sell the house despite many attempts on my part to assist you."

Also on September 6, Brymer executed a summons for unlawful detainer seeking to have debtor

evicted from her residence on the basis that "occupant forfeited option to purchase." (Pl's. Exs.

14, 21; Tr. 137-138) On the same day, September 6, 2006, debtor filed this chapter 13 case.

On September 25, 2006, debtor's counsel, Debra Corcoran, mailed to defendants Brymer,

Bradley and Great Northern a letter in which they were notified that debtor was rescinding the

Great Northern loan transaction pursuant to her rights under the Federal Truth in Lending Act, 15

U.S.C. § 1601 *et seq*. (TILA), and the Federal Homeowners Equity Protection Act, 15 U.S.C. §

1631 et seq. (HOEPA) (Pl's. Ex. 22) The defendants have not responded to this letter.

## The Adversary Proceeding.

Plaintiff debtor Tabitha M. Brannan initiated this adversary proceeding by her original

complaint filed September 7, 2006. An amended complaint was filed October 5, 2006, and a

second amended complaint on February 9, 2007. Plaintiff names as defendants, Brymer, Bradley,

Great Northern, Gladstone and Carl Bates, debtor's chapter 13 trustee. Bates has filed no

response to the complaint, and plaintiff argues that this failure to respond constitutes an implicit

permission to plaintiff to pursue the relief sought in the complaint.

The second amended complaint alleges five counts as follows:

Count I, fraudulent conveyance to Brymer of debtor's residence pursuant to Bankruptcy

Code §§ 548 and 550. Debtor seeks to have her transfer to Brymer set aside and title restored to

her.

Count II, fraudulent transfers of cash to Brymer pursuant to §§ 548 and 550. Debtor seeks

to recover the sum of $15,525.44 representing total loan payments from May 2005 to September

2, 2006 by debtor to Chase, the first deed of trust holder.

Count III, truth in lending violations by Brymer, Gladstone and Great Northern. Debtor seeks to rescind the transfer of her property pursuant to provisions of TILA and HOEPA, plus an award of damages and attorney fees.

Count IV, fraud. Debtor alleges that in her property transfer she was defrauded by defendants Brymer, Gladstone, and Bradley. Debtor requests the court to order defendants to return the property and to remove the cloud on title caused by the Great Northern second deed of trust. She also seeks actual damages.

Count V, punitive damages. Debtor alleges that the defendants perpetrated actual fraud, acting willfully, maliciously, and with conscious disregard for her rights.

Prayer. Debtor requests actual damages in the amount of $100,000.00.

## Positions of the Parties.

Plaintiff

Under count I, plaintiff asks that the transfer of her residence be avoided and title returned to her name. Count II seeks judgment against Brymer for sums plaintiff has made monthly directly to Chase as payments on the first mortgage. In count III, truth in lending, plaintiff asserts that she did not receive the proper disclosures at the time of the Great Northern loan closing in May 2005, which entitles her to rescind that transaction. She prays that the defendants be ordered to tender to her the deed to the residence, that they be ordered to pay her statutory damages under TILA, and that they be ordered to pay the costs, expenses and attorney's fees she incurred in bringing this action. Count IV is for common law fraud. Debtor asserts that she was not told that the transaction would divest her of a substantial amount of equity in the residence or that the May 2005 closing would result in her being divested of the residence but remain liable for the Chase first deed of trust. She prays that the court order defendants to tender

back a clear title. In count V, debtor asks for punitive damages, and in her prayer she asks for damages in the amount of $100,000.00.

## Defendants Brymer, Bradley, and Gladstone

Brymer, Bradley and Gladstone filed their answer to the complaint and advanced several affirmative defenses. They argue that TILA contains a one year statute of limitations beyond which plaintiff may not seek statutory damages. They also claim that defendants are entitled to a return of the $32,500.00 in value that defendants paid to plaintiff. They further argue that the doctrine of unclean hands prevents plaintiff from arguing that she did not know the contents of the documents she signed.

Gladstone has also filed a counterclaim, praying that the court order debtor to transfer the remaining sixty percent of her beneficial interest in the trust created April 2005.

## Defendant Great Northern

Great Northern has advanced four affirmative defenses: 1) that debtor lacks standing to recover under §§ 548 and 550; 2) that debtor must avoid the transfer of the residence to Brymer before the transfer from Brymer to Great Northern may be avoided; 3) that Great Northern gave value for the transfer of an interest in the residence and is thus protected under § 548(c); and 4) that Great Northern gave good faith in value without knowledge of the voidability of the transfer, thus entitling it to protection under § 550(b).

Great Northern has also asserted four cross-claims: 1) against Brymer, praying for judgment against him for the amounts due under his note to Great Northern, 2) against Brymer, praying for the same relief as the first cross-claim but basing its demand for relief upon the deed

11

of trust between Brymer and Great Northern,[2] 3) praying that if the court finds it to be liable to plaintiff in any way, Brymer be required to indemnify Great Northern to the extent that the liability arises from the Great Northern Deed of Trust transaction, and 4) praying for judgment against Brymer and Bradley as guarantors for amounts due under Brymer's note to Great Northern.

In response to Great Northern's cross-claims, Brymer asserts several affirmative defenses: 1) Great Northern has failed to foreclose on the deed of trust, thereby failing to mitigate its damages; 2) Great Northern must pursue the principal prior to going against the surety; and 3) Brymer has the right of set off.

Finally, the issue of jurisdiction was raised by Great Northern at trial. Great Northern argued that its deed of trust may not be removed from debtor's residence unless the trustees to the deed of trust are named as parties in this adversary proceeding. The court presumes that this argument is premised upon Rule 19 of the Federal Rule of Civil Procedure and Rule 7019 of the Rules of Bankruptcy Procedure, which provide that a party must be joined as a party if 1) "the court cannot accord complete relief" among the parties without the missing party or 2) the missing party "claims an interest relating to the subject of the action" and "resolution of the action would impair or impede [the missing party's] ability to protect [its] interest."

## Discussion and Conclusions of Law.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.

---

[2] Specifically, Great Northern relies upon the provision of the deed of trust that provides that any default on any prior lien on the residence would "constitute a default under the terms and conditions of this Deed of Trust and the Note secured hereby." Because the Chase deed of trust was in default at the time of the closing of the Great Northern deed of trust, Great Northern argues that the Great Northern deed of trust was in default from its inception.

12

AVOIDANCE COUNTS

In counts I and II of her complaint, debtor seeks to avoid or set aside the transfer of her residential real property to Brymer and also to set aside and recover the total monthly deed of trust payments that she made to Chase following the transfer. Debtor alleges she may avoid these transactions as fraudulent conveyances pursuant to Bankruptcy Code § 548, 11 U.S.C. § 548, and recover the property from Brymer pursuant to Bankruptcy Code § 550, 11 U.S.C. § 550.

Section 548 provides authority for a trustee in bankruptcy to avoid a debtor's actual or constructively fraudulent transfers of property that are made within two years prior to the debtor's bankruptcy filing.[3] Section 548(a)(1)(A) authorizes avoidance of a transfer made with actual fraudulent intent; § 548(a)(1)(B) authorizes avoidance of a transfer that was constructively fraudulent, *i.e.*, if the debtor received less than reasonably equivalent value in the exchange and the debtor was either insolvent or made insolvent by the transfer. Section 550 provides authority for a trustee to recover fraudulently transferred property or the property's value from a transferee.

As noted, these provisions specify that the avoidance powers may be exercised by a debtor's trustee in bankruptcy. Here, debtor's trustee has declined to bring an avoidance action, and it is the debtor who is asserting the trustee's avoidance powers. The only code provisions that authorize a debtor to exercise the trustee's avoidance powers under §§ 548 and 550 are found in § 522(h) and (g). Section 522(h) provides:

---

[3] The avoidance period under § 548(a)(1) and (b) was extended from one to two years by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), which was enacted on April 20, 2005, and for most purposes became effective 180 days later on October 17, 2005. However, under § 1406(b) of BAPCPA the extended two year limitations period for § 548(a)(1) and (b) avoidance actions applied only with respect to bankruptcy cases filed more than one year after the enactment date of April 20, 2005. BAPCPA, Pub. L. No. 109-8, §§ 1402, 1406, 119 Stat. 23 (2005). Debtor's chapter 13 case was filed on September 6, 2006, and the two year limitations period is therefore applicable.

13

(h) The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if -

(1) such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and

(2) the trustee does not attempt to avoid such transfer.

11 U.S.C. § 522(f).

Thus, a debtor may avoid a fraudulent transfer under § 548 only if the trustee does not attempt to avoid the transfer, and only to the extent that the debtor could have exempted the transferred property under § 522(g)(1) if the trustee had avoided it. In debtor's case, then, the key to debtor's authority to bring this § 548 avoidance action is whether the transferred property can be claimed exempt by her under § 522(g)(1). This subsection provides:

(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if -

(1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

(B) the debtor did not conceal such property; . . .

11 U.S.C. § 522(g)(1).

In summary, the plaintiff debtor in this case may avoid her transfer to Brymer under § 548 provided she can exempt the property under § 522(g)(1). She may exempt the property under this provision if the "transfer was not a voluntary transfer," and the property was not concealed by debtor. 11 U.S.C. § 522(g)(1).[4]

Although there are cases that have allowed a chapter 13 debtor to exercise the trustee's powers to bring a § 548 action, the provisions of § 522(h) and (g) are obvious limitations on the

---

[4] The Fourth Circuit has previously ruled that a transfer must be involuntary if it is to be set aside under §§ 548 and 522(g)(1). *See Tavenner v. Smoot (In re Smoot)*, 237 F.3d 401 (4th Cir. 2001)

14

debtor's standing, and the majority of courts have held that the debtor cannot exercise the

trustee's powers except within the confines of § 522(h). *See, e.g.* <u>Straight v. First Interstate Bank</u>

<u>of Commerce (In re Straight)</u>, 200 B.R. 923, 928 (Bankr. D. Wyo. 1996);[5] <u>Hollar v. United</u>

<u>States (In re Hollar)</u>, 184 B.R. 25 (Bankr. M.D.N.C.), *aff'd*, 188 B.R. 539 (M.D.N.C. 1995),

*aff'd*, 92 F.3d. 1179 (4th Cir. 1996) (unpublished opinion); *In re Bardell*, 361 B.R. 468, 474

(Bankr. N.D. W.Va.), *aff'd*, 374 B.R. 588 (N.D. W.Va. 2007).[6]

　　　In the parties' submissions to the court, there has been no discussion of the debtor's

standing to bring this adversary proceeding under § 548 in view of the restrictions under § 522(h)

and (g). In his proposed findings of fact and conclusions of law (docket 65), debtor's counsel

argues only that debtor could have exempted the property under her Virginia homestead

exemption and § 522(b)(3)(B).

　　　Counsel addresses indirectly the issue of whether the transfer of debtor's interest in the

residence was voluntary, citing a case in which a New York bankruptcy court considered

circumstances under which a debtor's conveyance of property might be considered an

---

[5] On appeal, the reviewing court found that the issue of standing had become moot, the case
having been converted to chapter 7 and a trustee having been joined to the action. 207 B.R. 217
(B.A.P. 10th Cir. 1997).

[6] "In the context of a Chapter 13 case, it is the trustee and not the debtor that has standing to
directly assert a § 544(a)(3) cause of action. *E.g., Crawley v. Aurora Loan Servs. (In re
Crawley)*, 318 B.R. 512, 517 (Bankr.W.D.Wis.2004) (denying a chapter 13 debtor's attempt to
avoid a creditor's mortgage lien because the debtors were not trustees and had not been given the
powers of a trustee under § 544); *Gilliam v. Bank of Am. Mortgage, L.L.C. (In re Gilliam)*, No.
02-24491, 2004 WL 3622646, *3, 2004 Bankr. LEXIS 1653, *8 (Bankr. D. Kan. October 28,
2004) (holding that a Chapter 13 debtor lacked standing to avoid a mortgage under § 544(a)(3));
*In re Binghi,* 299 B.R. 300, 303 (Bankr.S.D.N.Y.2003) (holding that chapter 13 debtors were
unable to avoid a creditor's unperfected secured claim because they lacked standing); *Hollar v.
United States (In re Hollar)*, 174 B.R. 198, 203 (Bankr.M.D.N.C.1994) (finding that "there is no
statutory authority in Chapter 13 which grants a Chapter 13 debtor independent standing to sue
under the trustee's ... avoidance power")." 361 B.R. at 474.

involuntary transfer because of undue coercion by the transferee. In *Davis v. Suderov (In re Davis);* 148 B.R. 165 (Bankr. E.D.N.Y. 1992), *aff'd,* 169 B.R. 285 ( E.D.N.Y. 1994), the court examined case law under which economic coercion or fraud might render a transfer involuntary and held under the facts before it that a debtor's pre-petition execution of a second mortgage on her residence was in fact involuntary because of the transferee's misrepresentations and "extraordinary sales pressure." *Id.* at 174.[7]

It is debtor's apparent position here that her transfer to Brymer was "not a voluntary transfer" as referred to in § 522(g). The court cannot agree. The evidence in this case does not reveal that Brymer applied undue pressure on debtor at the time of the transaction. The trust documents signed by debtor and her testimony at trial persuade the court that while she was not happy about it, she knew just what she was doing and acted under her "own free will." She initialed each paragraph of the trust agreement, which contained a statement that debtor was aware that Gladstone "plans to make, if possible, an unconscionable profit on this property." (Pl's. Ex. 5)[8]

---

[7] Quoting the case *of Reaves v. Sunset Branch, Nat'l Bank of S.D. (In re Reaves);* 8 B.R. 177, 181 (Bankr. D.S.D. 1981), Davis set out what the court considered an appropriate standard as follows:

> [A]n 11 U.S.C. Section 522(g)(1)(A) voluntary transfer occurs when a debtor, with knowledge of all essential facts and free from the persuasive influence of another, chooses of her own free will to transfer property to the creditor. A voluntary transfer does not occur where a creditor has harassed, insulted, and shamed a debtor into transferring the property to the creditor. Nor has a voluntary transfer occurred where a creditor has concealed or failed to inform a debtor of essential facts necessary for the debtor to make an intelligent decision on whether to transfer the property to the creditor. This is especially true where a debtor can show that she would not have made the transfer had she been informed of all the essential facts.

*In re Davis*, 148 B.R. at 173.
[8] In light of this discussion of debtor's actions, the court is unpersuaded by the affirmative defense advanced by defendants that debtor was acting with unclean hands.

16

In conclusion, as to the avoidance counts, the court finds that debtor made a voluntary transfer of her residence and thus lacks standing to bring this action under §§ 548 and 550. Therefore, debtor may not recover under counts I and II of the complaint.

 TILA COUNT

The third count of the complaint asserts a TILA count against Bradley, Brymer and Gladstone. In that count, debtor argues that debtor did not receive the proper disclosures at the time of the May 2005 loan closing, thereby entitling her to rescind that transaction.

TILA was enacted by Congress in order to protect the rights of consumers in specified credit transactions. The statute gives a consumer in those transactions a right to rescind the transaction for three days following the execution of a covered transaction. 15 U.S.C. § 1635(a). The rescission period may be extended to three years if the TILA-required disclosures are not accurate or are not provided to the consumer at the time of the transaction. 15 U.S.C. § 1635(f), 12 C.F.R. § 226.23(a)(3) (2007).

In order to rescind a typical covered consumer mortgage, TILA requires that the consumer give the lender notice of the rescission during the applicable rescission period. The lender then has twenty days within which to return all amounts paid by the consumer. Once that is done, the consumer must tender the property that was the subject of the transaction back to the lender. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3) (2007).

In addition to the remedy of rescission, TILA sets forth certain statutory damages allowable if the required disclosures do not comply with the provisions of TILA. Those damages are set forth at 15 U.S.C. § 1640(a). That section also contains a one-year statute of limitations. 15 U.S.C. § 1640(e). The one-year period begins to run in a closed-end credit transaction upon the date of the loan closing. *Tucker v. Beneficial Mortgage Co.*, 437 F.Supp.2d 584, 589-90

(E.D. Va. 2006); *see also Escher v. Decision One Mortgage Co. (In re Escher),* 369 B.R. 862

(Bankr. E.D. Pa. 2007). However, a consumer's ability to recover these statutory damages may

be resurrected in the event the lender fails timely to honor a proper request for rescission,

regardless of the one-year limitation of § 1640(e). 15 U.S.C. § 1635(g).

In this case, the central question in resolving the TILA claim advanced by debtor is

whether the transactions between debtor and Brymer, Bradley and Gladstone are transactions

that are subject to TILA. Debtor argues that the April 2005 transactions among debtor and

Brymer, Bradley and Gladstone in fact constituted an equitable mortgage under Virginia law,

which would therefore be covered by TILA. Debtor's argument is based upon TILA's definition

of a mortgage as "a consumer credit transaction that is secured by the consumer's principal

dwelling." 15 U.S.C. § 1602(aa)(1). Regulation Z, the implementing regulation of TILA,

supplements TILA's definition of "mortgage" by defining "security interest" as an interest

securing performance that is recognized by state law. 12 C.F.R. § 226.2(1)(25).

Thus, in addressing the applicability of TILA in this case, the court must determine

whether the transaction was really one that provided a creditor with an interest to secure

performance, and the court must further determine that the interest is recognized by Virginia law.

Debtor asserts that the transaction should be recharacterized as an equitable mortgage, which is

recognized under Virginia law, thus making TILA applicable.

In Virginia, a deed that is absolute on its face is presumed absolute unless the challenging

party can prove otherwise by clear and convincing evidence. *Pretlow v. Hopkins*, 30 S.E.2d 557,

558 (Va. 1947). In determining whether that presumption has been successfully rebutted, the

court must consider the facts and circumstances surrounding the transaction.

18

This court has previously had occasion to evaluate whether the facts and circumstances surrounding a transaction constituted an equitable mortgage. In *Seven Springs, Inc. v. Abramson (In re Seven Springs, Inc.)*, 159 B.R. 752 (Bankr. E.D. Va.1993), *aff'd,* 35 F.3d 556(4th Cir. 1994), the court set forth the factors to be considered in determining whether a transaction was in fact an equitable mortgage. The court noted that "[t]he first and foremost factor to be considered . . . is the existence of a borrower-lender relationship between the parties. A mortgage occurs when there is some debt between the grantor and the grantee which is secured by the conveyance transaction." *Id.* at 756. In other word, the buyer/seller relationship can be construed as a mortgagor/mortgagee relationship if the seller is transferring title as security for a debt.

In the present case, debtor transferred title to her property to the trust in order to give Brymer and Gladstone[9] security for the amounts paid to stop the Chase foreclosure. In fact, at trial, Brymer testified that debtor's initial deed of transfer into the trust "was only meant to be a temporary form of security that I had." (Tr. 173) Essentially, debtor promised to pay forty percent of the equity in the residence to Brymer and Gladstone in exchange for the advance of the $7,500.00 advanced to stop the Chase foreclosure. Title to the residence initially went into the trust to be held as security for debtor's tender of the forty percent at the time of the sale of the house.

Further, when Brymer borrowed additional funds from Great Northern and disbursed a portion of them to debtor, he intended the residence to serve as security. That this was contemplated is evidenced by the second paragraph of the April 27, 2005, letter agreement

---

[9]While Bradley was listed as trustee on the agreements signed by debtor, there is some ambiguity as to the role of Brymer. However, Brymer is listed on the signature page of the trust agreement. The court, based upon the reading of the trust agreement, finds that Brymer was intended to have actual trustee powers as well as Bradley.

signed by debtor in connection with the trust agreement: "Gladstone Enterprises has the right to

borrow money against its equity. I agree to cosign on this/these loan(s), provided they will not

show up on my credit report, I will not have to make any payments until the house is sold, and

my proceeds from the sale of the house will not be reduced."

Once a borrower-lender relationship is established, the court may look at the

circumstances to determine whether an equitable mortgage has been created. *Seven Springs*, 159

S.E.2d at 756. Factors listed in *Seven Springs* are:

> [1.] the continuing obligation of the grantor to pay the debt or meet the obligation which
> it is claimed the deed was made to secure;
> [2.] the relative values of what the grantor received as compared to what the grantee
> received in the transaction;
> [3.] the parties' contemporaneous and subsequent acts;
> [4.] the parties' declarations and admissions;
> [5.] the form of the written evidence of the transaction;
> [6.] the nature and character of the testimony relied upon, and;
> [7.] the apparent aims and purposes of the conveyance.

*Id.*

Evaluating the transaction at issue in light of the seven factors of *Seven Springs*, the court

concludes that the transaction between debtor and Brymer, Bradley and Gladstone was an

equitable mortgage. Debtor had a continuing obligation to pay forty percent of the equity in the

residence to Gladstone. The parties acted at all times as though the residence was security, and

the testimony of Brymer referred to above certainly evidences that intention. The documents

surrounding the transaction show that the intent of the parties was to secure payment of the forty

percent by debtor's placing the title to the residence into the trust and then assigning forty percent

of her equitable interest in that trust to Gladstone.

Two factors listed in *Seven Springs* bear further consideration. There is a great disparity

between the relative monetary values of what debtor received as compared to what she gave to

20

Gladstone. However, the court in this case considers that the urgency of debtor's need to stop the

foreclosure militates in favor of balancing those two amounts. Debtor was under severe

constraints to stop the foreclosure, and she realized that she may have been making a bad

bargain. This is evidenced in the provision of the letter agreement dated April 27, 2005, that "I

am ...fully aware that Gladstone Enterprises, Inc....plans to make, if possible, an unconscionable

profit on this property." Thus, the court discounts the monetary disparity between the $7,500.00

and the value of forty percent of debtor's equity in the residence.

A second factor that the court addresses is the representation of debtor in the April 27,

2005, letter agreement that "I know that this is not a loan, nor is the party accepting this sale a

lending institution." The court is not persuaded that this language is dispositive of any issues in

this adversary proceeding. Debtor is not an attorney and is not qualified to state what does or

does not qualify as a loan or a lending institution. The letter agreement was drafted on behalf of

Gladstone, and while debtor made some changes to the document, she cannot be expected to

know the legal implications of the language quoted in this paragraph. Thus, the court does not

attach a high degree of significance to this language in assessing the facts and circumstances

surrounding the transaction.

The court notes that this issue has been addressed by the Eastern District of Virginia

twice within the past several months. In two recent decisions, the district court in *Johnson v. D &*

*D Home Loans Corp.*, 2008 WL 850870 (E.D. Va. Jan 23, 2008), and *Clemons v. Home Savers,*

*LLC*, 2007 WL 2815213 (E.D. Va. Sept. 21, 2007), employed the same analysis as that set forth

above and concluded that the transactions before it did not constitute equitable mortgages and

were therefore not subject to TILA. While the underlying structures of the transactions before the

district court differed from the structure of the transaction in this case, giving rise to a different

result, the district court recognized that if a transaction were characterized as an equitable

mortgage under Virginia law, the transaction might be covered by TILA.

Because the court has found that the transaction at issue was an equitable mortgage

subject to TILA, it must now examine whether Brymer, Gladstone and Bradley are lenders

whose actions are covered by TILA. This more difficult TILA issue is raised by defendants'

argument that Brymer and Gladstone do not meet the definition of creditors for purposes of the

statute. Although this particular issue was not raised by defendants before or at trial, the court

has separately ruled that the defense may be raised.

Regulation Z of TILA, 12 C.F.R. § 226, provides that the provisions of TILA apply to

entities who enter into at least five consumer credit home loan transactions within the past

calendar year. Debtor failed to present this evidence. However, debtor also asserts that in view of

the high effective interest rate on her transaction, the definition of creditor supplied by 15 U.S.C.

§ 1602(f) applies: a creditor is a "person who originates 2 or more mortgages . . . in any 12-

month period or any person who originates 1 or more such mortgages through a mortgage broker

. . . ." 15 U.S.C. § 1602(f). The court finds that this definition is applicable because of the high

effective interest rate but cannot find that its requirements have been satisfied in this instance.

First, defendants are correct that there is nothing in the record to support debtor's

assertion that Brymer and Gladstone were brokers under provisions of 15 U.S.C § 1602(f). That

leaves the issue of whether Brymer and Gladstone were persons who originated "2 or more

mortgages . . . in any 12-month period . . . ." 15 U.S.C. § 1602(f). While the evidence in this case

reveals that Brymer and Gladstone had done a number of real property deals similar to the one in

this case, the only specific evidence of transactions in which their participation might be

considered in the nature of originating mortgages are the ones here at issue.

22

The memorandum opinion of April 14, 2008, set out the facts surrounding debtor's transactions with Brymer/Gladstone. The court concluded that their arrangement constituted a consumer mortgage transaction but did not consider whether it might be considered as two such transactions.

The initial pertinent documents were executed by debtor on April 27, 2005. These included a) an agreement and declaration of trust with debtor as grantor and defendant Bradley as trustee, b) a deed conveying title to debtor's realty to Bradley as trustee, c) an assignment of forty percent beneficial interest in the trust from debtor as assignor to defendant Gladstone as assignee, and d) a letter agreement signed by debtor only, which included a statement that she was transferring to Gladstone a forty percent interest in her property. The court previously ruled that both Bradley and Brymer were trustees. In exchange for debtor's execution of the documents, Brymer or Gladstone issued a check in the approximate amount of $7,500.00 that was used to cure the delinquency in debtor's first deed of trust held by Chase Manhattan Mortgage Corporation. The documents signed by debtor on April 27 were not recorded. Brymer intended that the deed would not be recorded but was to serve as his "temporary form of security" for the transaction.

The second phase of debtor's transaction with Brymer/Gladstone took place on May 31, 2005, when settlement took place on the Great Northern second deed of trust loan. In that transaction, debtor executed a second deed of her property, this time conveying title to Brymer as trustee. This deed was recorded as part of the Great Northern settlement. Brymer had previously told debtor that he was taking out this loan, and he agreed to debtor's request that she would receive $25,000.00 of the proceeds. The original principal loan amount was $74,725.00. In the settlement, debtor received the sum of $25,000.00 with the rest of the loan proceeds less costs

23

going to Brymer/Gladstone. Debtor did not sign any documents indicating that she was obligated under the Great Northern loan. Rather, Brymer was the obligor under this loan and Brymer and Bradley were liable as guarantors. Nevertheless, with respect to the Great Northern loan, Brymer made clear and debtor understood she was borrowing these funds and that it was her obligation to repay her share of the loan pursuant to the initial trust documents of April 27.

In summary, debtor executed and delivered two different deeds of her realty. The first deed conveyed title to Brymer/Bradley as trustees, which they took as security for their advancement of $7,500.00 to the first deed of trust holder on April 27, 2005. Debtor's second deed conveyed title to Brymer as trustee and was used by him as a basis to secure the Great Northern loan on May 31, 2005. From the proceeds of Brymer's mortgage loan transaction debtor borrowed $25,000.00 from Brymer. The court has found the effect of debtor's transfers was to create an equitable mortgage with debtor as mortgagor and Brymer/Gladstone as mortgagees. The mortgage secures the loans advanced to debtor.

But was this two mortgages so as to satisfy 15 U.S.C. § 1602(f)? While such an interpretation of the transfers has a certain logical appeal, the court is unwilling to stretch the equitable mortgage concept to such an extent. Notwithstanding that there were two separate disbursements of funds, debtor entered into a single contractual arrangement with the defendants. Her first deed was withdrawn and replaced by the second deed at settlement on May 31. Although the second deed of trust loan was not mentioned in the original papers signed by debtor, it was within contemplation of the transaction. Moreover, at that time everyone understood that debtor was to repay the funds she had received upon the sale of her property. The fact that Brymer/Gladstone took out their own mortgage does not equate to two consumer mortgages for debtor.

24

Accordingly, the court concludes that debtor cannot invoke the provisions of TILA because the mortgagees Brymer/Gladstone are not creditors for purposes of 15 U.S.C. § 1602(f). Judgment will be entered for defendants on this count.

Nevertheless, the court will enter judgment to the effect that the subject real property stands as security held by Brymer/Gladstone/Bradley as an equitable mortgage for repayment of all amounts owed by debtor under the April 27, 2005, trust agreement and supporting documents.

FRAUD AND PUNITIVE DAMAGES COUNTS

Debtor has requested an award of punitive damages in the amount of $100,000.00 because the actions of Brymer, Bradley and Gladstone constituted actual fraud. While the court finds that Brymer may have been motivated by greed (acknowledging that he might stand to make an unconscionable profit on the deal), it cannot agree with debtor's claim that Brymer perpetrated actual fraud or acted willfully, maliciously and with conscious disregard of debtor's rights. To prevail on an actual fraud claim under Virginia law, debtor must prove her case by clear and convincing evidence, *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999), and debtor here has failed to do so.[10] Therefore, the punitive damages request will be denied. This finding necessarily requires that debtor's claim for damages arising from Brymer's alleged fraud be denied as well.

CROSS-CLAIM AGAINST BRYMER BY GREAT NORTHERN AND GLADSTONE COUNTERCLAIM AGAINST DEBTOR

In addressing the cross-claim of Great Northern against Brymer and Bradley, the court finds that Brymer executed a promissory note in favor of Great Northern in the amount of

---

[10] The court is of the opinion that the dispute between debtor and Brymer over which party is ultimately responsible for the debt to Great Northern is a dispute as to the terms of the contract between debtor and Brymer and is not in the nature of a fraud perpetrated against debtor by Brymer.

25

$74,725.00, which he has failed to repay. The note was guaranteed by Bradley. In its opinion of April 14, 2008, the court ruled that judgment would be issued against Brymer and Bradley for any amount due Great Northern under the promissory note. However, this ruling is no longer viable.

Judgment will be entered for all defendants with respect to the TILA and HOEPA allegations. With this ruling, there is nothing left in the complaint by which the court may enter any judgment against Great Northern regarding the validity of its security. Accordingly, Great Northern must be dismissed from the case. Debtor will have to challenge Great Northern's lien in another way, either by a new adversary proceeding or perhaps even by objecting to Great Northern's proof of claim, if one is filed.

Great Northern's dismissal as a party to this adversary proceeding leaves the court without jurisdiction to enter judgment for Great Northern on Brymer's note as the claim is no longer a core or non-core related matter within the bankruptcy court's jurisdictional limits under 28 U.S.C. § 157. Thus, Great Northern's cross-claim against Brymer and Bradley will be dismissed.

Gladstone has counterclaimed against debtor, arguing that under the April 2005 letter agreement, she should be required to turn over her remaining sixty percent interest in the residence. However, in accordance with the earlier equitable mortgage discussion, there is no basis at this time to require debtor to transfer any interest in the property to Brymer/Gladstone. The court rules in favor of debtor on that counterclaim, without prejudice to the right of Gladstone and Brymer to pursue their remedies under the equitable mortgage.

A separate order will be issued in accordance with this amended opinion.

Signed_____

/s/ Douglas O. Tice Jr.
CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

Copies to:

Tabitha M. Brannan
10009 Grass Market Court
Fredericksburg, VA  22408
*Debtor*

Augustus C. Epps, Jr., Esq.
Christian & Barton, L.L.P.
909 E. Main St., Suite 1200
Richmond, VA  23219-3095
*Counsel for Debtor*

Debra. D. Corcoran, Esq.
P.O. Box 29421
Richmond, VA  23233
*Counsel for Debtor*

Teddy J. Midkiff, Esq.
Goff & Midkiff, PLLC
10310 Memory Lane, Suite 2-C
P.O. Box 313
Chesterfield, VA  23832
*Counsel for Gladstone Enterprises, Inc., Caitlin Bradley, Alan Brymer*

Christopher G. Hill, Esq.
Roy M. Terry, Jr., Esq.
DurretteBradshaw, PLC
Main Street Centre
600 E. Main Street, 20th Floor
Richmond, VA  23219
*Counsel for Great Northern Trading Company*

Carl M. Bates
600 East Main Street
P.O. Box 1819 Richmond, VA  23218
*Chapter 13 Trustee*